NO. 14-1522 (L)

# United States Court of Appeals
*for the*
# Fourth Circuit

MYLAN PHARMACEUTICALS INC.,
WATSON LABORATORIES, INC.,
and
LUPIN PHARMACEUTICALS, INC.

*Plaintiffs-Appellants*

– v. –

U.S. FOOD AND DRUG ADMINISTRATION
and
TEVA PHARMACEUTICALS USA, INC.

*Defendants-Appellees*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA AT CLARKSBURG

## BRIEF OF APPELLANTS MYLAN PHARMACEUTICALS INC. AND
WATSON LABORATORIES, INC.

DOUGLAS B. FARQUHAR
JENNIFER M. THOMAS
HYMAN, PHELPS & MCNAMARA, P.C.
  700 13th Street N.W., Suite 1200
  Washington, D.C. 20005
  (202) 737-5600

RALPH S. TYLER
VENABLE LLP
  575 7th Street N.W.
  Washington, D.C.  20004
  (410) 244-7436

*Counsel for Mylan Pharmaceuticals Inc.*

CHAD A. LANDMON
AXINN, VELTROP & HARKRIDER LLP
  950 F Street, N.W.
  Washington, D.C. 20004
  (202) 912-4700

MARK D. ALEXANDER
AXINN, VELTROP & HARKRIDER LLP
  90 State House Square, 9th Floor
  Hartford, CT 06103-3704
  (860) 275-8100

*Counsel for Watson Laboratories, Inc.*

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Mylan and Watson respectfully submit the following disclosure required by

Fed. R. App. P. 26.1:

1.    Mylan Pharmaceuticals Inc. is a wholly owned subsidiary of Mylan

Inc., a publicly held company whose stock is traded on NASDAQ

under the symbol "MYL."

2.    Mylan Pharmaceuticals Inc. is a pharmaceutical company specializing

in the development, manufacture, and marketing of affordable generic

medicines.

3.    Watson Laboratories, Inc. is a wholly owned subsidiary of Actavis

plc, a publicly held company whose stock is traded on NYSE under

the symbol "ACT."

4.    Watson Laboratories, Inc. is a pharmaceutical company focused on

developing and manufacturing generic drug products.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... i

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ..................................................................... iv

JURISDICTIONAL STATEMENT ............................................................. 1

SUMMARY OF THE CASE ....................................................................... 2

STATEMENT OF ISSUES ......................................................................... 6

STATEMENT OF THE CASE ..................................................................... 6

STATEMENT OF FACTS ........................................................................... 7

    I.   Statutory Background ............................................................... 7

    II.  Factual Background ................................................................. 12

SUMMARY OF ARGUMENT .................................................................... 16

ARGUMENT ............................................................................................ 18

    I.   Standard of Review .................................................................. 18

    II.  FDA's Decision to Award Teva a Revived Period of 180-Day Exclusivity Contravenes the Clear Statutory Language, and Is Unreasonable, Arbitrary, and Capricious. .................................. 19

        A.  The Statute Unambiguously Forecloses FDA's Interpretation of the "Court Decision Trigger." ............................................ 19

            1.   The Plain Meaning and Statutory Context Dictate that the Court Decision Trigger Must Apply to the Federal Circuit's 2008 Mandate. ............................................ 21

            2.   The District Court's Decision on the Merits Was Based on an Erroneous Reading of the Statute. ................................ 27

        B.  Even if the Statute Were Ambiguous, FDA's Interpretation of the Court Decision Trigger Is Not Reasonable. ........................ 32

III. FDA's Denial of Shared Exclusivity to First-Filers to the '048 Patent Is Inconsistent with the Statute, Arbitrary, and Capricious. ...................... 38

CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*aaiPharma Inc. v. Thompson*,
   296 F.3d 227 (4th Cir. 2002) ........................................................................... 33

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ................................................................... 19, 33

*Apotex Inc. v. FDA*,
   414 F. Supp. 2d 61 (D.D.C. 2006) ......................................................... 22, 28, 40

*Bd. of Governors of Univ. of N. Carolina v. U.S. Dep't of Labor*,
   917 F.2d 812 (4th Cir. 1990) ........................................................................... 33

*Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ........................................................................ 41

*Burlington N. and Santa Fe Ry. Co. v. Surface Trans. Bd.*,
   403 F.3d 771 (D.C. Cir. 2005) ........................................................................ 41

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984) ................................................................................. 17, 20, 32

*Freeman v. Altvater*,
   138 F.2d 854 (8th Cir. 1943) ........................................................................... 36

*Grant v. Raymond*,
   31 U.S. 218 (1832) ........................................................................................... 35

*Granutec, Inc. v. Shalala*,
   139 F.3d 889 (4th Cir. 1998) (unpublished decision) ................................... 3, 29

*Green v. Bock Laundry Mach. Co.*,
   490 U.S. 504 (1989) ........................................................................................ 27

*Hi-Tech Pharmacal Co., Inc. v. FDA*,
   587 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................... 11

*House v. Young*,
   12 F. Cas. 598 (N.D. Ohio 1867) (No. 6738) ................................................. 36

*Inwood Labs., Inc. v. Young*,
    723 F. Supp. 1523 (D.D.C. 1989).............................................................3, 29, 30

*Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*,
    No. 10-978, 2011 WL 7030963 (M.D. Fla. Nov. 10, 2011).............................. 36

*MobileMedia Ideas, LLC v. Apple, Inc*.,
    885 F. Supp. 2d 700 (D. Del. 2012) ................................................................ 34

*Moffitt v. Garr*,
    66 U.S. 273 (1861)........................................................................................... 35

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto.
    Ins. Co.*, 463 U.S. 29 (1983).......................................................................32, 43

*Mylan Pharms., Inc. v. Shalala*,
    81 F.Supp.2d 30 (D.D.C. 2000)....................................................................... 24

*Mylan Pharms., Inc. v. Thompson*,
    139 F. Supp. 2d 1 (D.D.C. 2001)...................................................................... 33

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co*.,
    522 U.S. 479 (1998) ......................................................................................... 26

*Nellcor Puritan Bennett LLC v. CAS Med. Sys., Inc*.,
    No. 11-cv-15697, 2012 WL 3525636 (E.D. Mich. Aug. 14, 2012)................... 36

*Nostrum Pharms., LLC v. FDA*,
    No. 11-3111, 2011 WL 2652147 (D.N.J. July 6, 2011) .................................... 11

*O'Reilly v. Morse*,
    56 U.S. 62 (1853)............................................................................................. 35

*Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*,
    473 F.3d 94 (4th Cir. 2006).............................................................................. 44

*Peck v. Collins*,
    103 U.S. 660 (1880).......................................................................................... 35

*Ranbaxy Labs. Ltd. v. Leavitt*,
    469 F.3d 120 (D.C. Cir. 2006) ......................................................................33, 42

*Ranbaxy Labs., Ltd. v. Leavitt*,
  459 F. Supp. 2d 1 (D.D.C. 2006)..................................................................... 42

*Ratzlaf v. United States*,
  510 U.S. 135 (1994)....................................................................................... 26

*Russell v. Dodge*,
  93 U.S. 460 (1876)......................................................................................... 35

*Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*,
  731 F.2d 818 (Fed. Cir. 1984)........................................................................ 36

*Senju Pharm. Co., Ltd. v. Apotex Inc.*,
  746 F.3d 1344 (Fed. Cir. 2014) ..................................................................... 35

*Shanty Town Assocs. Ltd. P'ship v. E.P.A.*,
  843 F.2d 782 (4th Cir. 1988).......................................................................... 33

*Shipbuilders Council of Am. v. U.S. Coast Guard*,
  578 F.3d 234 (4th Cir. 2009).......................................................................... 20

*Stone v. Instrumentation Lab.Co.*,
  591 F.3d 239 (4th Cir. 2009).......................................................................... 19

*Teva Pharms. USA, Inc. v. Sebelius*,
  95 F.3d 1303 (D.C. Cir. 2010) ....................................................................... 33

*Teva Pharms., USA, Inc. v. FDA*,
  182 F.3d 1003 (D.C. Cir. 1999)...................................................................... 31

*Tolbert v. Stevenson*,
  635 F.3d 646 (4th Cir. 2011) .......................................................................... 26

*Torpharm, Inc. v. Shalala*,
  No. 97-1925, 997 WL 33472411 (D.D.C. Sept. 15, 1997)............................... 24

*United States v. Diapulse Corp. of Am.*,
  748 F.2d 56 (2d Cir. 1984).............................................................................. 41

*United States v. Lehman*,
  225 F.3d 426 (4th Cir. 2000)........................................................................... 21

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
  944 F.2d 870 (Fed. Cir. 1991) .......................................................... 34

*W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
  553 F.3d 292 (4th Cir. 2009) ........................................................... 19

*Watson Labs., Inc. v. Sebelius*,
  No. 12-1344, 2012 WL 6968224 (D.D.C. Oct. 22, 2012) ................................ 40

*Zoltek Corp. v. United States*,
  58 Fed. Cl. 688 (Fed. Cl. 2003) ........................................................ 34

### Docketed Cases

*G.D. Searle LLC v. Lupin Pharms., Inc.*, No. 2:13-cv-00121 (E.D. Va.
  Mar. 14, 2014) ........................................................................ 43

### Statutes, Regulations, and Legislative Materials

Federal Food, Drug, and Cosmetic Act, 21 U.S.C.

§ 355 et seq. ........................................................................... 7

§ 355(b) ................................................................................ 7

§ 355(b)(1) ............................................................................ 38

§ 355(b)(1)(G) ................................................................... 8, 25, 38

§ 355(c)(2) ............................................................................ 38

§ 355(j)(2)(A)(vii) .................................................................. 9, 39

§ 355(j)(2)(A)(vii)(VI) ................................................................ 25

§ 355(j)(2)(B) ......................................................................... 9

§ 355(j)(5)(B)(iv) ............................................................. 10, 14, 22

§ 355(j)(5)(B)(iv)(I)-(II) ............................................................ 8, 9

§ 355(j)(5)(B)(iv)(II) ......................................................... 3, 19, 29

§ 355(m) .............................................................................. 23

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1292 ..................................................................................... 1

28 U.S.C. § 1331 ..................................................................................... 1

28 U.S.C. §1361 ...................................................................................... 1

35 U.S.C. § 251(a) ................................................................................. 12

5 U.S.C. § 706(2)(A) ............................................................................. 19

5 U.S.C. § 706(2)(C) ............................................................................. 19

Fed. R. App. P. 26.1 ................................................................................. i

Medicare Prescription Drug, Improvement, and Modernization Act, Pub.
    L. No. 108-173, 117 Stat. 2066 (2003) ............................................. 8

The Drug Price Competition and Patent Term Restoration Act, Pub. L.
    No. 98-417, 98 Stat. 1585 (1984). .................................................... 2

## Other Authorities

Enoxaparin Sodium Injection,
    Approval Letter, ANDA No. 077857 (July 23, 2010) ...................... 11

Fluoxetine Delayed-release Capsules, 90 mg (Once-Weekly),
    Approval Letter, ANDA No. 078572 (Mar. 22, 2010) ..................... 37

FDA, Guidance for Industry, 180-Day Exclusivity When Multiple
    ANDAs Are Submitted on the Same Day (July 2003) ....................... 9

## JURISDICTIONAL STATEMENT

This action for declaratory and injunctive relief arises under the FDC Act, 21 U.S.C. §§ 301-397; and the Administrative Procedure Act, 5 U.S.C. §§ 551-706. The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1361.  This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292, because the District Court entered a final judgment, in addition to an interlocutory order denying a preliminary injunction.

The District Court's memorandum opinion and order denying Mylan's motion for preliminary injunction was entered on May 29, 2014.  Mylan timely filed its notice of appeal on May 30, 2014.  Lupin filed its notice of appeal of the order denying the preliminary injunction on June 3, 2014.  The District Court entered a final judgment on June 16, 2014.  Mylan timely filed its notice of appeal of the final judgment on June 16, 2014.  Lupin timely filed a notice of appeal of the final judgment on July 2, 2014.  Watson filed a notice of appeal of both orders on June 16, 2014.  Thus, appeals of both District Court decisions are timely.

### REPRODUCTION OF
### STATUTORY AND REGULATORY PROVISIONS

The statutory sections at issue in this case are reproduced in an Addendum to this brief.

1

## SUMMARY OF THE CASE

The U.S. Food and Drug Administration ("FDA"), in its April 24, 2014 Decision underlying this litigation (the "FDA Decision"), ignored the plain statutory language of the Hatch-Waxman Amendments governing the 180-day marketing exclusivity period for generic drug manufacturers. Congress specifically provided that a court decision finding a patent invalid triggers the running of the exclusivity period relating to that patent, which courts have described as the "court decision trigger." The FDA Decision, however, contravened the clear statutory language and invented an exception to the court decision trigger by creating ambiguity where none existed, denying multiple generic drug manufacturers the opportunity to distribute generic versions of one of the highest-grossing drugs currently available. The District Court upheld the FDA Decision. FDA – and the District Court – should be reversed.

Specifically, Congress provided that a court decision finding a patent invalid triggers the running of the generic drug marketing exclusivity period relating to that patent. The relevant statutory provision of the Hatch-Waxman Amendments[1] states that the period of 180-day marketing exclusivity for a generic drug begins running on:

---

[1] The Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

2

> (II) the date of a decision of a court in [relevant patent litigation] holding the patent which is the subject of the certification to be invalid or not infringed . . . .

Federal Food, Drug, and Cosmetic Act ("FDC Act") § 505(j)(5)(B)(iv)(II), 21 U.S.C. § 355(j)(5)(B)(iv)(II) (2002); Addendum.  There are no statutory exceptions to this provision.  Yet, the FDA Decision ignored this clear statutory language and unlawfully invented an exception from the court decision trigger for a "patent which is the subject of the certification" if that patent – an original patent – is later reissued, even when the exclusivity period attributable to the original patent expired more than five years before issuance of the reissue patent.  FDA reached its decision by altering the clear statutory language defining the date when a generic drug marketing exclusivity period begins to run.

When FDA tried in the past to change the legal requirements for generic drug marketing exclusivity periods, courts, including this Court, reversed FDA.[2] The Court should do the same in this case.

---

[2]    *Inwood Labs., Inc. v. Young*, 723 F. Supp. 1523, 1526 (D.D.C.), *vacated as moot,* 43 F.3d 712 (D.C. Cir. 1989) (court rejected FDA attempt to add requirement that generic drug company could earn generic drug marketing exclusivity period only if sued by patent holder); *Mova Pharm.Corp. v. Shalala*, 955 F. Supp. 128, 130 (D.D.C. 1997), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998) (rejecting FDA attempt to read "successful defense" requirement into same provision); *accord Granutec, Inc. v. Shalala*, 139 F.3d 889 (4th Cir. 1998).

This case concerns the right to market generic versions of Celebrex®, a drug used for treatment of arthritis that has been sold by Pfizer Inc. ("Pfizer") for more than 16 years, with total 2013 U.S. sales of more than $2 billion.  Complaint at 9, Watson Intervenor Complaint at 10; J.A. 26, 127.  The effect of the FDA Decision was that FDA refused to grant final approval on May 30, 2014 to generic drug manufacturers other than Defendant-Appellee Teva Pharmaceuticals, Inc. ("Teva") for their generic versions of Celebrex®.

The FDA Decision held that Teva's 180-day marketing exclusivity period tied to an original patent for Celebrex® did not begin to run in 2008, despite FDA's admission that the patent was invalidated by a final court decision in 2008.  Thus, FDA determined that Teva's exclusivity period blocked approvals for any other manufacturers of the generic version of Celebrex®.  As a result, and because Teva entered into an agreement with Pfizer that settled their patent litigation and restricted Teva's ability to begin marketing the drug, consumers remain unable to obtain lower-priced generic versions of this important drug.

The FDA Decision unlawfully determined that Teva's 180-day marketing exclusivity period had not expired, even though it started running – and should have expired – in 2008, because of the final court decision holding the relevant patent invalid.  The District Court refused to reverse the FDA Decision, erroneously construing the clear statutory definition of the court decision trigger,

4

despite ruling that "it appears that *Congress was referring* only *to original*, and not all, *patents when it drafted the court decision trigger clause.*"  J.A. 272 (emphasis added).  That finding by the District Court is fundamentally inconsistent with its ultimate holding that a final court decision invalidating the original patent did <u>not</u> operate as a court decision trigger.

Thus, on May 30, 2014, only Teva received final FDA approval to market the relevant dosage strengths of its generic version of Celebrex®.  Pfizer's patent litigation settlement with Teva prohibits Teva from launching its generic product until December 2014, or earlier under certain circumstances.  And the FDA Decision, upheld by the District Court, prevents any other manufacturer from marketing a generic version of the drug until 180 days after Teva begins commercial marketing.  Consequently, absent action by this Court, no other generic drug manufacturers – including Plaintiff-Appellant Mylan Pharmaceuticals Inc. ("Mylan"); Appellant Watson Laboratories, Inc. ("Watson"), which intervened as a plaintiff in the District Court; and Appellant Lupin Pharmaceuticals, Inc. ("Lupin"), which also intervened as a plaintiff in the District Court – will likely receive FDA final approval for the relevant dosage strengths of their generic versions of Celebrex® until June 2015.

In erroneously granting a period of 180-day exclusivity to Teva, FDA, and then the District Court, also denied Mylan, Watson, and Teva their statutory right

to a *shared* period of 180-day exclusivity tied to the reissue patent for Celebrex®.
This denial – which presents a separate and distinct issue from whether Teva's
period of exclusivity tied to the original patent expired in 2008 – directly conflicts
with the statutory framework, and is unlawful, arbitrary, and capricious.

Both parts of the FDA Decision should be reversed, as should the District
Court ruling upholding the FDA Decision.

## STATEMENT OF ISSUES

1.    Whether the FDA Decision was unlawful, arbitrary, and capricious because
it determined, contrary to the clear statutory language of the Hatch-Waxman
Amendments, that a final court decision invalidating an original patent is not
a court decision trigger for 180-day generic drug marketing exclusivity if the
invalid patent is later replaced by a reissue patent.

2.    Whether the FDA Decision to deny eligible generic drug manufacturing
companies a period of shared exclusivity tied to the reissue patent was
arbitrary, capricious, or otherwise not in accordance with law.

## STATEMENT OF THE CASE

Mylan brought this action in the United States District Court for the
Northern District of West Virginia immediately following issuance of the FDA
Decision, and Watson and Lupin timely intervened.  Mylan, joined by Watson,
sought judicial review of the FDA Decision that adopted an unauthorized

6

interpretation of the court decision trigger in the FDC Act. Mylan moved immediately for a preliminary injunction, a motion that Watson and Lupin joined, to enjoin operation of the FDA Decision pending full judicial review, because Mylan would be irreparably harmed if the FDA Decision were to remain in effect beyond May 30, 2014. The District Court denied the preliminary injunction. The District Court then converted its ruling on the merits of Mylan's preliminary injunction motion to a final judgment on June 16, 2014. Both decisions have been appealed, and the appeals are consolidated in this Court.

## STATEMENT OF FACTS

### I.    STATUTORY BACKGROUND

The FDA Decision interprets provisions of the FDC Act, which, as amended by the Hatch-Waxman Amendments, govern the approval of generic drugs. *See* FDC Act § 505, 21 U.S.C. § 355 *et seq*. Pioneer, or brand, companies file a New Drug Application ("NDA") for FDA approval to market a new drug product, and NDAs contain evidence of clinical testing establishing the safety and efficacy of the drug. FDC Act § 505(b), 21 U.S.C. § 355(b). Generic drug companies are permitted to market the generic version of a drug that was the subject of an NDA approval – after relevant patent protections have expired or have been successfully challenged – by filing an Abbreviated New Drug Application ("ANDA") that establishes bioequivalence to the NDA drug, which is referred to as the "Reference

Listed Drug."  21 C.F.R. § 314.3 (2013).  The FDC Act provides that, under

certain conditions, an ANDA applicant is entitled to a 180-day period during which

FDA cannot approve ANDAs of subsequent applicants for the same drug.  FDC

Act § 505(j)(5)(B)(iv)(I)-(II), 21 U.S.C. § 355(j)(5)(B)(iv)(I)-(II) (2002). [3]  This is

commonly referred to as "180-day exclusivity."  The statutory preconditions for

180-day exclusivity include the following:

1.   The holder of an NDA for a brand drug, like Celebrex®, is
     required to submit to FDA for listing in the publication
     *Approved Drug Products with Therapeutic Equivalence
     Evaluations* (the "Orange Book") "the patent number and the
     expiration date of *any patent*" that covers the brand drug or a
     method of using that drug.  FDC Act § 505(b)(1)(G), 21 U.S.C.
     § 355(b)(1)(G) (emphasis added).

2.   An ANDA applicant is required to submit one of four types of
     certifications (or a statement) to "*each patent*" listed in the
     Orange Book for the brand drug, one of which certifies that the
     patent in question is "invalid or will not be infringed" (a
     "Paragraph IV" certification).  FDC Act § 505(j)(2)(A)(vii), 21

--------

[3]   As the parties and the District Court agree, exclusivity periods for celecoxib
(the active ingredient in Celebrex® and the name for the generic version of the
drug) are governed by the version of the FDC Act in effect prior to enactment of
the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L.
No. 108-173, 117 Stat. 2066 (2003) ("MMA"), because the first ANDA for
celecoxib with a Paragraph IV certification was submitted to FDA prior to the
December 8, 2003 enactment of the MMA.  FDC Act § 505(j)(5)(B)(iv)(I)-(II), 21
U.S.C. § 355(j)(5)(B)(iv)(I)-(II) (2002).  The FDA Decision acknowledges this, as
does the District Court decision.  *See* FDA Decision at 3, Slip Op. at 5-6 n.2; J.A.
43, 255-56.  The text of Section 505 prior to the MMA is reproduced in the
Addendum.  Unless otherwise noted, all FDC Act citations herein are to the pre-
MMA version of the statute.

U.S.C. § 355(j)(2)(A)(vii) (emphasis added).  The submission of a Paragraph IV certification is capable of forming, and often does form, the basis for patent infringement litigation between the ANDA applicant and the patent holder.  *See* FDC Act § 505(j)(2)(B), 21 U.S.C. § 355(j)(2)(B).

3.    If the ANDA applicant is the first to submit a Paragraph IV certification to the particular patent, it becomes a so-called "first-filer" for purposes of 180-day exclusivity.  FDC Act § 505(j)(5)(B)(iv)(I)-(II), 21 U.S.C. § 355(j)(5)(B)(iv)(I)-(II) (2002).  If multiple applicants submit ANDAs containing Paragraph IV certifications on the same day, 180-day exclusivity can be shared.[4]

The specific statutory provision at issue in this case governs the commencement of the 180-day period of marketing exclusivity to which an ANDA applicant is entitled provided that the above conditions are met, i.e., (1) the patent has been listed in the Orange Book; (2) the ANDA applicant filed a Paragraph IV certification to that patent and notified the patent holder and NDA holder of the certification; and (3) the ANDA applicant was the first to file a Paragraph IV certification to that patent.  In such circumstances, the statute provides that the 180-day exclusivity period begins to run (or is "triggered") on:

---

[4]    This "shared exclusivity" policy is articulated in FDA guidance.  *See* FDA, Guidance for Industry, 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day, at 4-5 (July 2003), *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation /Guidances/ucm072851.pdf.

> (I) the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application,[5] or
>
> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, [6]
>
> whichever is earlier.

FDC Act § 505(j)(5)(B)(iv)(I)-(II), 21 U.S.C. § 355(j)(5)(B)(iv) (2002); Addendum.  In other words, the 180-day marketing exclusivity period awarded to a company that was the "first-filer" begins to run when the first-filer commences commercial marketing of the drug (the commercial marketing trigger) or when the patent subject to the certification is held invalid or not infringed (the court decision trigger), whichever occurs first.

An ANDA applicant that is the first to file a Paragraph IV certification to a patent, thereby creating the basis for a period of 180-day exclusivity tied to that

---

[5]    The "trigger" in this subparagraph is referred to as the "commercial marketing trigger," which occurs if the first-filer (described in the subparagraph as the "applicant under the previous application") begins marketing the generic version of the drug.  If commercial marketing begins prior to a "court decision trigger," the 180-day marketing exclusivity period begins to run on the date that commercial marketing begins.

[6]    Throughout this brief, quotations from this subparagraph, defining the court decision trigger, generally replace the phrase "an action described in clause (iii)" with the phrase "relevant patent litigation."  The "action" described is patent litigation between an ANDA holder and the patent holder or NDA filer and is based on the ANDA holder's Paragraph IV certification that the patent is invalid or not infringed.

patent, must "clear the patent thicket" entirely in order to take advantage of its statutory boon. Thus, if a first-filer to a particular patent wins a court decision declaring that patent invalid, unenforceable, or not infringed, but fails to win a comparable decision as to other patents covering the drug, it cannot market the generic version of the drug during the period of exclusivity tied to the patent that was declared invalid, because the other patents still apply to block marketing. No provision of the statute precludes such a result, and, indeed, it is not unusual for a marketing exclusivity period to expire before first-filers are able to market the drug. *See, e.g., Hi-Tech Pharmacal Co., Inc. v. FDA*, 587 F. Supp. 2d 1, 4 (D.D.C. 2008); *Nostrum Pharms., LLC v. FDA*, No. 11-3111, 2011 WL 2652147, at *3 (D.N.J. July 6, 2011) (court upheld FDA's decision that the exclusivity period for Nostrum on one patent had expired, but Nostrum had obtained a separate and distinct exclusivity period for a different patent); *see also* Enoxaparin Sodium Injection, Approval Letter, ANDA 077857 (July 23, 2010), *available at* http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/077857s000ltr.pdf. With regard to enoxaparin sodium, a court decision triggered the exclusivity period for enoxaparin sodium injection, but the holder (or holders) of that exclusivity period was unable to market because it had not yet obtained FDA approval. The exclusivity expired, and the ANDA of a different company, Sandoz Inc., was approved first.

11

The relevant original patent for Celebrex®, U.S. Patent No. 5,760,068 ("the '068 patent"), was reissued on March 5, 2013, as U.S. Patent No. RE 44,048 ("the '048 patent"). Reissue patents are a subcategory of patents under U.S. patent law. A reissue patent is issued by the United States Patent and Trademark Office ("PTO") upon submission of a new and amended patent application when the original patent is "deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent . . . ." 35 U.S.C. § 251(a). A patent holder must surrender the predecessor patent as a condition of obtaining a reissue patent. *Id*.; 37 C.F.R. § 1.178(a). Once a reissue patent is issued for a drug that is the subject of an NDA, the NDA holder must list the patent in the Orange Book, as FDA concedes (FDA Decision at 4-5; J.A. 44-45, discussed further below). Also, once the reissue patent is published in the Orange Book, all ANDA applicants must file a certification to that patent (or a statement) under the Hatch-Waxman Amendments, just as they must for any other patent.

## II.    FACTUAL BACKGROUND

The FDA Decision addressed the statutory provisions governing both the creation of 180-day exclusivity, and the triggering and expiration of such exclusivity under the following factual circumstances:

1.     Teva certified in its ANDA for celecoxib that a patent covering that drug,  the '068 patent,[7] was invalid or not infringed, pursuant to the FDC Act, and Teva was the first filer to certify to that patent (Complaint at 10, FDA Decision at 1; J.A. 27, 41);

2.     Teva was challenged in litigation by the patent-holder (G.D. Searle, which was acquired by Pfizer), and the U.S. Court of Appeals for the Federal Circuit held that the '068 patent was invalid, with a mandate that issued on May 13, 2008  (Complaint at 10-11, FDA Decision at 1; J.A. 27-28, 41);

3.     Teva was not able to market its product following the court mandate on the '068 patent because the Federal Circuit held that two other patents listed in the Orange Book for Celebrex®, U.S. Patent Nos. 5,466,823 ("the '823 patent") and 5,563,165 ("the '165 patent"), were valid and infringed by Teva; thus, Teva failed to "clear the patent thicket" (*id*.);

4.     On September 5, 2008, four months after the Federal Circuit's mandate invalidating the '068 patent, Pfizer submitted the '068 patent to the PTO for reissue proceedings  (Watson Intervenor Complaint at 3; J.A. 120)

5.     Nearly five years after the Federal Circuit's mandate on the '068 patent, on March 5, 2013, the PTO issued a reissue patent,the '048 patent, replacing the '068 patent  (Complaint at 12, FDA Decision at 1; J.A. 29, 41); and

6.     Teva and several other companies, including Mylan and Watson, first-filed Paragraph IV certifications to the '048 reissue patent, and were challenged in litigation by the patent holder in the U.S. District Court for the Eastern District of Virginia  (Complaint at 12-14, FDA

_____

[7]     A copy of the patent is available here:  http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=5,760,068.PN.&OS=PN/5,760,068&RS=PN/5,760,068.

Decision at 1, Watson Intervenor Complaint at 3; J.A. 29-30, 41, 120); that litigation resulted in the District Court invalidating the patent, but that decision was appealed, is therefore not final, and does not qualify as a court decision trigger (Complaint at 13, FDA Decision at 1; J.A. 30, 41).

The FDA Decision interpreted the FDC Act as follows:

- "[S]ection 505 of the FD&C Act [providing that the exclusivity period is to run as of 'the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed'] is silent as to the effect of reissued patents on 180-day exclusivity." FDA Decision at 9; J.A. 49.

- "We conclude that the 'court-decision-trigger' provision of section 505(j)(5)(B)(iv) is ambiguous regarding a scenario in which an ANDA applicant makes a paragraph IV certification to an original patent, a court finds the patent invalid, and the [PTO] reissues the patent before any other [ANDA] applicant [has obtained final FDA approval]. In these circumstances, the statute is ambiguous regarding whether such a court decision should be considered to hold 'the patent which is the subject of the certification to be invalid or not infringed.'" FDA Decision at 10; J.A. 50 (citing FDC Act § 505(j)(5)(B)(iv), 21 U.S.C. § 355(j)(5)(B)(iv) (2002)).

- Under Section 505, FDA will treat "an original and reissued patent as a single 'bundle' of rights for purposes of 180-day exclusivity." FDA Decision at 9; J.A. 49.

- In light of the statute's purported ambiguity, "we believe that when a paragraph IV certification has been made to an original patent, subsequent paragraph IV certifications to a reissued patent that references the original patent should not be the basis for [a] separate period []of 180-day exclusivity." *Id*.

Based on these statutory interpretations, FDA granted Teva 180-day exclusivity to market generic celecoxib stemming from Teva's having filed the first Paragraph IV certification to the '068 patent. *Id.* ("eligibility for 180-day exclusivity would

14

remain intact for the first applicant on the original patent."). FDA acknowledges,

however, that the May 13, 2008 Federal Circuit mandate would have caused

Teva's exclusivity to expire in November 2008 were it not for the issuance of the

'048 reissue patent nearly five years later. *See* FDA Decision at 1 n.1, Prelim. Inj.

Hearing Transcript at 60; J.A. 41, 200. Nevertheless, FDA denied final approval to

all ANDA applicants other than Teva. FDA also denied Mylan and Watson, as

first-filers to the '048 reissue patent, a period of 180-day exclusivity tied to the

'048 patent, which the two companies would have shared with Teva, because Teva

also qualified as a first-filer to the '068 patent. Complaint at 11; J.A. 28.

On May 30, 2014, consistent with the FDA Decision, FDA issued a final

approval to Teva for the relevant strengths of celecoxib, but informed Mylan and

Watson that their final approvals were being withheld because of the exclusivity

period, which was granted to Teva. *See* Mylan Mot. Expedited Briefing, Ex. 3

(D.I. 19). The immediate practical effect of the FDA Decision is to prevent these

other ANDA applicants from entering the market for six months, if not more. In

all likelihood, because of a settlement agreement between the brand drug

manufacturer and Teva, the FDA Decision will delay Mylan and Watson, and

15

perhaps others, including Lupin, from receiving  FDA final approvals to market

generic celecoxib for nearly a year.[8]

## SUMMARY OF ARGUMENT

This appeal presents two separate and distinct questions.  The first is

whether the Teva exclusivity period tied to the '068 patent expired in 2008.  It did.

Once this first question is answered in the affirmative, the second question is

whether the first-filers to the '048 patent (which include Teva) are entitled to a

shared period of exclusivity tied to the '048 patent.  They are.

The FDA Decision, upheld by the District Court, unlawfully disregarded

clear statutory language in determining that Teva's exclusivity period with respect

to the '068 patent did not expire 180 days after the court decision trigger occurred

in May 2008.  Both FDA and the District Court found the statutory language

defining the court decision trigger to be ambiguous.  However, there is nothing

ambiguous about the statute.  When the Federal Circuit issued its May 2008

mandate holding the '068 patent invalid, the clear statutory language directed that

Teva's exclusivity period tied to the '068 patent began to run and expired 180 days

_____

[8]      If this Court determines that Teva's period of exclusivity tied to the '068 patent has in fact expired, and also decides that Mylan, Watson, and Teva share a period of exclusivity tied to the '048 patent, Lupin would be delayed from entering the market for an additional 180 days.

later, which was nearly six years ago. "Where the 'intent of Congress is clear …

the court, as well as the agency, must give effect to the unambiguously expressed

intent of Congress.'" *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837,

842-43 (1984). The District Court even recognized that the court decision trigger

refers to a court decision affecting the original patent – not the reissue patent – yet

inexplicably disregarded this clear statutory language and its own analysis of this

point. The District Court stated that, whatever the rule for other patents, using

traditional tools of statutory interpretation, "it appears that Congress was referring

only to original, and not all, patents when it drafted the court decision trigger

clause." J.A. 272. Under *Chevron* Step One, this Court need look no further than

the plain statutory language.

Even if this Court determines that the statutory language is unclear, which it

is not, and the Court thus engages in review of the FDA Decision under what

courts have referred to as *Chevron* "Step Two," FDA's reading of the statutory

language must be rejected because it produces the absurd result that competing

drug manufacturers can never know whether the exclusivity period has expired,

given that a reissue patent could conceivably be granted at any time. *Chevron*, 467

U.S. 842-43. Similarly, FDA's "bundle of rights" approach produces the absurd

and logically inconsistent result that a 180-day exclusivity period is transferred

from an original to a reissue patent, while the triggering and expiration of that

17

same period do *not* carry forward.  The FDA Decision is thus based on an

unreasonable interpretation of the statutory language and must be rejected for that

reason, as well.

     The second question presented by this case is whether the first-filers to the

'048 patent – believed to include Mylan, Watson, and Teva – are entitled to a

shared exclusivity period tied to that patent, because Teva's original exclusivity

period tied to the '068 patent has expired and the '048 patent is a new and distinct

patent.  Such an exclusivity period should be awarded to Mylan, Watson, and Teva

because the statutory framework compels that result.  Moreover, maintaining a

separate exclusivity period for the first-filers to the reissue patent is the only

reading of the statute consistent with the purposes of the Hatch-Waxman

Amendments.[9]

## **ARGUMENT**

### I.    STANDARD OF REVIEW

     Because the issues on appeal are limited to the legal conclusions in the

District Court order denying the preliminary injunction and the Final Judgment, the

standard of review here is de novo.  *See Stone v. Instrumentation Lab.Co*., 591

---

[9]     Appellant Lupin is filing a separate brief arguing that first-filers to the '048 patent are not entitled to shared 180-day exclusivity.

F.3d 239, 242-43 (4th Cir. 2009) ("a question of statutory interpretation . . . is a question of law that we review *de novo*"); *W.V. Ass'n. of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (legal conclusions in preliminary injunction decision are reviewed de novo).

## II.    FDA'S DECISION TO AWARD TEVA A REVIVED PERIOD OF 180-DAY EXCLUSIVITY CONTRAVENES THE CLEAR STATUTORY LANGUAGE, AND IS UNREASONABLE, ARBITRARY, AND CAPRICIOUS.

### A.    The Statute Unambiguously Forecloses FDA's Interpretation of the "Court Decision Trigger."

The statutory provision at issue mandates that a 180-day exclusivity period is triggered by a "decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed."  FDC Act § 505(j)(5)(B)(iv)(II), 21 U.S.C. § 355(j)(5)(B)(iv)(II) (2002).

Agency actions are reviewed under the Administrative Procedure Act ("APA").  *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001).  Under the APA, a court is directed to "hold unlawful and set aside agency action" that it finds to be (1) in excess of statutory jurisdiction or (2) arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).  In determining whether an agency's interpretation is in excess of statutory jurisdiction, the Court must employ the two-step analysis of *Chevron*.  At *Chevron* Step One, the Court must look to the plain language of the relevant statute and exhaust "the 'traditional tools of statutory construction'" to ascertain Congressional intent.  *Chamber of Commerce*

19

*of U.S. v. N.L.R.B.*, 721 F.3d 152 (4th Cir. 2013) (quoting *Chevron*, 467 U.S. at 842 n.9).  Thus, the Court must give effect to each word and clause of the statutory provision, in context, to determine whether the statute unambiguously forecloses FDA's interpretation.  *See Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d 234, 244-45 (4th Cir. 2009) ("we have a duty, where possible, to give effect to all operative portions of the enacted language, including its every clause and word" (internal quotations omitted)); *Chamber of Commerce*, 721 F.3d at 162 ("in addition to the language of the [statutory provision] itself, we must look to the specific context in which that language is used, and the broader context of the statute as a whole" (internal quotations omitted)).

Within the statutory context – and giving effect to each word as written – the plain meaning of the court decision trigger admits no ambiguity.  The statute expressly forecloses FDA's position.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43.[10]

---

[10]    FDA's analysis of the court decision trigger language is found at pages 9-11 of the FDA Decision.  J.A. 49-51.

20

     **1.**    **The Plain Meaning and Statutory Context Dictate that the Court Decision Trigger Must Apply to the Federal Circuit's 2008 Mandate.**

As detailed in the Statutory Background section, the court decision trigger is the final step in a series of linked statutory provisions that create and define 180-day exclusivity periods.  Each of these statutory provisions is tied to a certification that is, in turn, tied to a patent.  There is no dispute that the '068 patent was listed by the NDA holder, and that it was the "subject of the certification" Teva submitted in 2003 along with its ANDA for celecoxib.  Submission of that certification established Teva as a first-filer with respect to the '068 patent.  Further, FDA does not dispute that the May 13, 2008 Federal Circuit mandate was a final "decision of a court" holding the '068 patent invalid.  FDA Decision at 1; J.A. 41.  Thus, had this Court inquired of FDA (or Teva) on May 14, 2008, as to whether Teva's 180-day exclusivity tied to the '068 patent had been triggered and was then running, the answer would have been an unequivocal "yes."  *See id*.  But FDA claims that the statutory language somehow permits FDA to create a retroactive exception from the court decision trigger for court decisions on patents that are, years later, the subject of a reissue.

The starting point of any statutory analysis is the plain meaning of the provision itself.  *See United States v. Lehman*, 225 F.3d at 426, 428 (4th Cir. 2000) ("A fundamental canon of statutory construction requires that 'unless otherwise

defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)). As the District Court acknowledged, "the ordinary understanding of the words 'a' and 'the' is that they refer to singular items." J.A. 271-72. "At *Chevron* Step One, the Court 'must assume that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Id*. (quoting *Apotex Inc. v. FDA*, 414 F. Supp. 61, 70 (D.D.C. 2006) (per curiam)). The District Court recognized that "it appears that Congress was referring only to original, and not all, patents when it drafted the court decision trigger clause," because the court decision trigger language refers to "*a* decision of a court [on] . . . *the* patent which is the subject of the certification." J.A. 272. Thus, even the District Court's decision acknowledges that a literal reading of the statutory language dictates that "the patent" refers only to the '068 patent, rather than to any combination of the '068 and '048 patents. It further follows that "*a* decision of a court" necessarily means a single court decision on the original patent, not multiple court decisions invalidating both an original patent and a reissue patent. Under the plain meaning of Section 505(j)(5)(B)(iv), when a final invalidity decision as to the '068 patent was rendered in 2008, Teva's exclusivity period began to run.

There is no statutory authority for FDA to resurrect a terminated exclusivity period. Indeed, neither FDA nor the District Court identified any statutory

22

provision that even arguably authorizes FDA to rewrite the statutory definition of a court decision trigger.

The meaning FDA seeks to attribute to the court decision trigger can only be achieved by inserting plural elements that are not in the statute. FDA asserts that "the patent" can be interpreted to refer to a "bundle of rights" composed of both the original and reissue patent. FDA Decision at 5; J.A. 45. By first-filing certifications to an original patent and timely filing a certification to a reissue patent, FDA contends, a generic drug manufacturer obtains a period of 180-day exclusivity tied to "the patent." FDA Decision at 9; J.A. 49. For that to be the case, however, the statutory phrase "the patent which is the subject of the certification" would have to be revised (essentially, rewritten) to allow for multiple final decisions of multiple courts invalidating both the original patent and the reissue patent. And the use by Congress of the singular term "patent" would have to be disregarded.[11] FDA has no authority to rewrite the unambiguous words of the statute.

---

[11]    Because the FDC Act defines "patent" as "a patent issued by the [PTO]" – which would include both original and reissue patents – original and reissue patents are separate patents for the purposes of the FDC Act. FDC Act § 505(m), 21 U.S.C. § 355(m) (2002).

23

This is not the first time FDA has given an erroneous interpretation to the plain language "a decision of a court." In *Torpharm, Inc. v. Shalala*, the court rejected FDA's argument that the there is any ambiguity in the provision, holding that "[t]he natural meaning of the statute's reference to 'the court' is 'the court that decides that the patent is invalid or not infringed.'" No. 97-1925, 997 WL 33472411, at *3 (D.D.C. Sept. 15, 1997). In *Mylan Pharms., Inc. v. Shalala*, the court held "that the FDA exceeded its authority in promulgating a regulation which is contrary to the plain meaning of the statut[ory] . . . phrase 'a decision of a court' . . . ." 81 F. Supp. 2d 30, 47 (D.D.C. 2000). In both *Torpharm* and *Mylan*, the District Court for the District of Columbia concluded that the natural meaning of the phrase "a decision of a court" refers to either a district or appellate court decision, regardless of whether the court's decision was subject to being appealed. *See Mylan*, 81 F. Supp. 2d at 47; *Torpharm*, 1997 WL 33472411, at *3. Similarly here, the natural meaning of "a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed" dictates that the provision must apply to "the patent which is the subject of the certification," regardless of whether that patent is later reissued.

Furthermore, FDA's creation of an exception from the court decision trigger for patents that are later the subject of a reissue is inconsistent with the rest of the statutory framework governing 180-day exclusivity, and produces absurd results.

24

The court decision trigger is meaningless without reference to the other statutory provisions governing the listing of patents in the Orange Book and ANDA applicant certifications to such patents. *See* FDC Act § 505(b)(1)(G), (j)(2)(A)(vii)(IV), 21 U.S.C. § 355 (b)(1)(G), (j)(2)(A)(vii)(VI). Together, these provisions create and define 180-day exclusivity. And each of these provisions has long been interpreted by FDA to apply to original patents and, separately, to reissue patents. Namely, an NDA holder must submit to FDA for listing in the Orange Book any original patent, and separately, *any reissue patent*, that covers its drug. *See* FDA Decision at 4; J.A. 44 ("the NDA applicant or holder is expected to submit the reissued patent for listing in the Orange Book . . . "). An ANDA applicant must then certify to each original patent and, separately*, to each reissue patent*. *See* FDA Decision at 5; J.A. 45 ("FDA believes it is appropriate to require ANDA applicants to amend their ANDAs to certify to a timely filed reissued patent . . ."). FDA's present assertion that the triggering provision, alone, applies to original and reissue patents as a "bundle" is the interpretive equivalent of deciding that "sugar," if it appears three times in a recipe as an ingredient, means "sugar" in two places, and "honey" in a third. Equally absurd is FDA's contradictory interpretations of the same word ("patent") in the Hatch-Waxman Amendments. FDA twice (with regard to listing and certifying) interprets it to mean that original and reissue patents are separate and distinct, and once (with

25

regard to the court decision trigger) to mean that an original and reissue patents are a "bundle of rights."

FDA's attempt to define "patent" differently in the context of the court decision trigger from how it defines that term elsewhere is at odds with the fundamental canon of statutory interpretation that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994); *see also Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co*., 522 U.S. 479, 501 (1998) ("similar language contained within the same section of a statute must be accorded consistent meaning"); *Tolbert v. Stevenson*, 635 F.3d 646 (4th Cir. 2011) (holding that repeated use of the term "action" within a single statutory section to encompass an entire case or suit confirmed that another use of "action" within that section had the same meaning). FDA's position that a "patent" constitutes a "bundle of rights" in only one instance of several within a single statutory section cannot withstand scrutiny.

FDA's interpretation also produces absurd results. Under the plain language of the court decision trigger, and applying common sense, when a first filer obtains a final court decision and thereby triggers the start of its 180-day exclusivity tied to the original patent, all of the competitors who were not first-filers would understand that the period of exclusivity will expire 180 days later, and act

26

accordingly.  But, under FDA's tortured revision of the statute, the later filers cannot be at all certain that the exclusivity period expires as otherwise expected – nor commence the expensive and time-consuming preparations to market their products once the FDC Act permits generic competition – because at some point in the future a reissue patent may be issued that resuscitates the "zombie" exclusivity period.  A statutory interpretation that produces absurd results cannot be condoned by this Court under any circumstances, and even more so when the plain language of the statute provides an approach that is rational.  *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring) (reasoning that the Court must avoid interpreting a statute to produce an absurd result where an alternative meaning is possible).  The FDA Decision is contrary to the plain language of the statute and should be reversed.

## 2.    The District Court's Decision on the Merits Was Based on an Erroneous Reading of the Statute.

The District Court failed to conduct the requisite analysis under *Chevron* Step One and exhaust traditional tools of statutory construction in determining whether Congress spoke clearly as to the precise question at issue here – namely, whether the Federal Circuit's 2008 mandate invalidating the '068 patent was a court decision trigger.

In determining that the statutory court decision trigger was ambiguous, the District Court's analysis erroneously conflated the questions of: (1) whether a

27

period of exclusivity tied to an original patent was triggered by "a decision of a court" on that patent, and thus expired 180 days later; and (2) whether reissue patents could give rise to a separate period of 180-day exclusivity. Echoing that error in the analysis, the District Court concluded that "ambiguity exists here with respect to the court decision trigger clause's treatment of exclusivity periods for reissued patents." J.A. 270. However, the issue with respect to the court decision trigger in this case is *not* its treatment of any exclusivity period tied to the '048 reissue patent, but its treatment of the exclusivity period tied to the original '068 patent, which was only much later the subject of a reissue.

Further, in reaching its conclusion, the District Court noted that "the 'court-decision trigger language [] does not necessarily define what causes the exclusivity entitlement to arise.'" *Id*. (citing *Apotex Inc. v. FDA*, 414 F. Supp. 2d at 71 (per curiam)). However, the occasional lack of clarity about whether certain conditions give rise to an "exclusivity entitlement" is immaterial to the plain statutory language defining the court decision trigger. Finally, as noted above, the District Court failed to act in accordance with its proper conclusion that the ordinary meaning of singular words used in the court decision trigger provision dictates that it was intended to apply to an original patent, likely because the District Court mistakenly focused on the entirely separate question of whether a separate period of 180-day exclusivity tied to a reissue patent exists. *Id*. at 21-22.

28

Notably, in similar instances in which FDA attempted to revise the text of the statutory 180-day exclusivity framework, reviewing courts reversed FDA at *Chevron* Step One, rather than deferring to agency language at odds with the statute, as the District Court did here.  In *Granutec, Inc. v. Shalala*, for example, this Court determined that the same statutory provision at issue here *unambiguously* precluded FDA's regulation interpreting the statute to require that "the applicant submitting the first application has successfully defended against a suit for patent infringement."  139 F.3d 889, at *3 (4th Cir. 1998) (unpublished decision) (quoting 21 C.F.R. § 314.107(c)(1) (1997)).  Employing traditional tools of statutory construction, the *Granutec* court reasoned that FDA's so-called "successful defense" interpretation "adds a requirement not contemplated in the statute, and . . . renders superfluous 21 U.S.C.A. § 355(j)(4)(B)(iv)(I), which allows the 180-day period to begin at the time FDA receives notice of marketing of the drug, regardless of the outcome of any infringement suit."  *Id*. at *7.  In the present case, FDA has added an *exception* not contemplated in the statute, and thereby rendered the court decision trigger at 21 U.S.C. § 355(j)(5)(B)(iv)(II) (2002) entirely meaningless where there remains any possibility that the patent to which it applies could one day be reissued.

In *Inwood Labs., Inc. v. Young*, the U.S. District Court for the District of Columbia similarly determined that the statute was unambiguous on its face, and

FDA could not insert a provision – that did not exist – requiring patent litigation. 723 F. Supp. 1523, 1526 (D.D.C. 1989). The *Inwood* court reasoned that "[t]he two alternatives [for triggering 180-day exclusivity] are clear, and they establish a complete and workable statutory scheme . . . ." *Id.* Similarly, here, FDA's insertion of an extra-statutory exception undermines the proper functioning of the statutory scheme Congress devised.

Furthermore, if the District Court in this case were correct that the relevant statutory language ("the patent which is the subject of the certification") is ambiguous simply because it does not explicitly address every fact pattern covered by its language, virtually any language in any federal statute would be similarly ambiguous. There is no dispute that the '068 patent was the subject of the certification that Teva filed with FDA in November 2003. Nor is there any dispute that the May 2008 mandate of the Federal Circuit was a final court decision invalidating that patent – FDA admitted as much, twice, in the FDA Decision. *See* FDA Decision at 1, 1 n.1; J.A. 41.

To render the statute ambiguous, FDA must torture the language to mean that a "patent which is the subject of the certification" cannot include an original patent if that patent is later surrendered and replaced by a reissue patent, although the District Court also said that the interpretation advanced by Mylan is reasonable. J.A. 271. The District Court decided that this supposed ambiguity means that this

30

and other language about a "patent" that leads to a marketing exclusivity period cannot include a reissue patent. But that conclusion – even if it is accurate (and it is not, *see* Section III, *infra*) – does not compel, or even support, a finding that the court decision trigger does not include a court decision invalidating an original patent. The language, of course, does not exclude any particular type of patent from the definition of "the patent" invalidated, just as it does not exclude any kind of "final court decision" invalidating a patent.[12] The attempt to manufacture ambiguity about what "the patent" means is just as seriously flawed as FDA's previous attempts to reword the statutory provisions governing 180-day exclusivity, and closely resembles its attempt to exclude from the phrase "court decision" a decision dismissing an action for declaratory judgment.[13] Just as the courts rejected FDA's attempt to redefine "court decision" in that case, *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999), this Court should dismiss FDA's attempt to redefine "the patent which is the subject of the certification" as not including the '068 patent. Accordingly, the FDA Decision and the District Court's decision should be reversed.

---

[12]    In fact, FDA treats other classes of patents, such as continuation and divisional patents, as falling under the "patent" definition.

[13]    As noted above, "patent" is defined by the FDC Act to mean any patent issued by the PTO.

###    B.    Even if the Statute Were Ambiguous, FDA's Interpretation of the Court Decision Trigger Is Not Reasonable.

Even if this Court does not find that the statutory court decision trigger compels reversal under *Chevron* Step One, the Court should set aside the FDA Decision under *Chevron* Step Two because it is not "based on a permissible construction of the statute," i.e., it is arbitrary and capricious. *Chevron*, 467 U.S. at 843-44. Agency action is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The FDA Decision constitutes an unexplained departure from FDA's long-standing and judicially recognized *ministerial* role with respect to patents by simultaneously interpreting patent law (which FDA is not charged with administering) and demonstrating that FDA lacks expertise to do so. FDA's "bundle of rights" approach to original and reissue patents is entirely unfounded in patent law, or in any prior FDA decision or action. Furthermore, FDA's "bundle of rights" interpretation produces an absurd situation wherein the statutory exclusivity period tied to an original patent is carried forward by virtue of a reissue patent, but the statutory triggering and expiration of that exclusivity is *not* carried

32

forward. Finally, FDA's approach is unreasonable from a policy perspective, because it sows confusion and is demonstrably not, as FDA claims, a vehicle for consistency and predictability.

FDA has long asserted that its role regarding patents under the Hatch-Waxman Amendments is purely ministerial. *See aaiPharma Inc. v. Thompson*, 296 F.3d 227, 241 (4th Cir. 2002); *Teva Pharms. USA, Inc. v. Sebelius,* 595 F.3d 1303 (D.C. Cir. 2010); *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 125 (D.C. Cir. 2006), *abrogated by Teva Pharms. USA,* 595 F.3d 1303; *Am. Bioscience, Inc.*, 269 F.3d at 1084; *Mylan Pharms., Inc. v. Thompson*, 139 F. Supp. 2d 1, 10-11 (D.D.C. 2001), *rev'd on other grounds*, 268 F.3d 1323 (Fed. Cir. 2001). FDA has no expertise in patent law, and its considerations of patent law are not entitled to any judicial deference. *See Bd. of Governors of Univ. of N. Carolina v. U.S. Dep't of Labor*, 917 F.2d 812, 816 (4th Cir. 1990) ("In those instances where an agency has ruled on a question of law outside of its area of expertise, we no longer defer to the rulings of the agency, but instead conduct the more searching inquiry of de novo review."); *Shanty Town Assocs. Ltd. P'ship v. E.P.A.*, 843 F.2d 782, 791 n.12 (4th Cir. 1988). Yet, the FDA Decision, which promulgated a "bundle of rights" approach to original and reissue patents, required FDA to delve into the relative complexities of the patent statute and regulations governing those types of patents. *See* FDA Decision at 3-4; J.A. 43-44.

33

FDA's foray into patent law demonstrates that FDA should be required to continue to follow a ministerial approach.  The only case FDA cited in the FDA Decision and before the District Court to justify its "bundle of rights" theory, *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991), is inapposite, and FDA's reliance on *Vaupel* evinces a fundamental misunderstanding of the "bundle of rights" concept under patent law. *Vaupel*, like other cases discussing a bundle of patent rights, relates specifically to the "bundle of rights" associated with a single patent, which can be divided and assigned to licensees.  In other words, rather than bundling two patents together to create the "bundle of rights" invented by FDA, patent cases discussing the "bundle of rights" recognize that a single patent can bestow this bundle, even if the patent is a reissue patent.  *See Zoltek Corp. v. United States*, 58 Fed. Cl. 688, 698 (Fed. Cl. 2003) (applying the "bundle of rights" approach to a reissue patent, without reference to the original patent); *see also MobileMedia Ideas, LLC v. Apple, Inc.*, 885 F. Supp. 2d 700, 707 (D. Del. 2012) (in a case involving sixteen patents, including at least one reissue patent, the court reasoned with respect to those patents that "[a] patent is a bundle of rights which may be divided and assigned or retained in whole or in part" (internal quotations omitted)).  By the logic of these "bundle of rights" patent cases, the '048 reissue patent would be a completely

separate "bundle of rights" disconnected from the "bundle of rights" that comprised the original '068 patent before its surrender.

Moreover, over a hundred and fifty years of patent case law dictates that a reissue patent is separate and distinct from the original patent, not a "bundle of rights" with the original. *See, e.g., Peck v. Collins*, 103 U.S. 660, 664 (1880) ("[I]f a reissue is granted, the patentee has no rights except such as grow out of the reissued patent. He has none under the original. That is extinguished."); *Russell v. Dodge*, 93 U.S. 460, 463 (1876) (characterizing a reissue patent as a "new patent"); *Moffitt v. Garr*, 66 U.S. 273, 279 (1861) ("[T]he act of surrender extinguishes the right of the action so far as the old patent is concerned . . . . The only right saved is under a reissue, and in virtue of the new patent . . . [B]ut the only rights which survive the surrender [of the original patent], survive alone by virtue of the new patent."); *O'Reilly v. Morse*, 56 U.S. 62, 112 (1853) (describing reissue as "[t]he right to surrender the old patent, and receive another in its place"); *Grant v. Raymond*, 31 U.S. 218, 224 (1832) (referring to a reissue patent as a "new patent").[14]

---

[14]     *See also Senju Pharm. Co., Ltd. v. Apotex Inc.*, 746 F.3d 1344 (Fed. Cir. 2014) (reaffirming *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir. 2012)); *Aspex Eyewear, Inc.*, 672 F.3d at 1341-42 (describing reissue as "the issuance of a new patent."); *Seattle Box Co., Inc. v. Indus. Crating & Packing,*

Nor can FDA's "bundle of rights" approach with regard to the court decision trigger be traced to the precedents FDA cites in the FDA Decision: the FDA letters on Mircette, Ultracet and Adderall.  *See* FDA Decision at 7-8; J.A. 47-48.  None of these prior letter decisions were put before a court to test whether it was consistent with the statute.  Further, none of FDA's cited examples involved an exclusivity period tied to an original patent that would have expired – based on operation of the court decision trigger – years before the reissue patent issued.   FDA acknowledges as much in the FDA Decision, noting that in the three examples it cites exclusivity was deemed to be triggered by either a court decision on the *reissue* patent, or by commercial marketing.   FDA Decision at 9; J.A. 49.  Application of the court decision trigger to an original patent was not at issue in those instances.

Furthermore, in the case of fluoxetine, a drug that FDA does not cite in the FDA Decision but that Mylan raised before the District Court , there was a final

---

*Inc*., 731 F.2d 818, 829 (Fed. Cir. 1984) ("When a reissue patent issues, a new patent with presumably valid claims exists."); *Freeman v. Altvater*, 138 F.2d 854, 857 (8th Cir. 1943) ("Reissue is the act of the commissioner in granting a new patent."); *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*, No. 10-978, 2011 WL 7030963, at *2 (M.D. Fla. Nov. 10, 2011) ("[T]he law is abundantly clear that an original patent is void and unenforceable after it is surrendered in a reissue proceeding."); *Nellcor Puritan Bennett LLC v. CAS Med. Sys., Inc*., No. 11-cv-15697, 2012 WL 3525636 (E.D. Mich. Aug. 14, 2012) (recognizing a reissue patent as a new and distinct patent); *House v. Young*, 12 F. Cas. 598 (N.D. Ohio 1867) (No. 6738) (referring to a reissue patent as a "new patent").

court decision of non-infringement with respect to both an original and a reissue

patent, as well as a third patent.  FDA's approval letter to a subsequent ANDA

applicant that was blocked by the first-filer's exclusivity identifies each of the

three patents tied to that exclusivity, but nowhere suggests that the three patents (or

two of the three patents, the original and the reissue) are "bundled" together to

create exclusivity.  Indeed, FDA did not distinguish the original and reissue patent

from the third patent at all.  *See* Fluoxetine Delayed-release Capsules, 90 mg

(Once-Weekly), Approval Letter, ANDA No. 078572 (Mar. 22, 2010), *available at*

http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/078572s000ltr.pdf.

Similarly, even if FDA's "bundle of rights" approach were a linguistically

feasible interpretation of the statutory language, which it is not, the interpretation is

not a permissible or reasonable one because it produces the absurd result that a

180-day exclusivity period would carry forward from an original to a reissue

patent, while the triggering and expiration of that same period do *not* carry

forward.  By its interpretation, FDA is arbitrarily cherry-picking when original

patents and reissue patents create a "bundle of rights," and when they do not.

Finally, FDA's interpretation of the statute unnecessarily introduces

uncertainty into the framework governing 180-day exclusivity.  If an expired

marketing exclusivity period can be resuscitated when a patent is reissued – even

58 months (or more) after the exclusivity period expired – there can be no

37

predictability for ANDA applicants that they will be able to market once they

receive final approval, because a reissue patent could be sought and granted at any

time.

III.  **FDA'S DENIAL OF SHARED EXCLUSIVITY TO FIRST-FILERS TO THE '048 PATENT IS INCONSISTENT WITH THE STATUTE, ARBITRARY, AND CAPRICIOUS.**

FDA's denial of shared 180-day exclusivity to the first-filers to certify to the

'048 patent is inconsistent with the FDC Act, arbitrary, and capricious.  The statute

dictates that Mylan, Watson, and Teva be granted shared 180-day exclusivity under

the framework of the Hatch-Waxman Amendments.

Under *Chevron* Step One, the language of the FDC Act is clear:  exclusivity

can be associated with "any" patent.  Specifically, as summarized above, the

Hatch-Waxman Amendments set out a series of conditions that, when met, create

180-day exclusivity.  These provisions dictate first that an NDA sponsor submit

with its application "the patent number and the expiration date of *any patent* which

claims the drug for which the applicant submitted the [NDA] or which claims a

method of using such drug . . . ."  FDC Act § 505(b)(1)(G); 21 U.S.C.

§ 355(b)(1)(G) (emphasis added).  FDA publishes the patent information in the

Orange Book.  FDC Act § 505(b)(1), (c)(2), 21 U.S.C. § 355(b)(1), (c)(2).  The

FDC Act then requires each ANDA applicant to submit a certification "with

respect to *each patent* which claims the listed drug . . . or which claims a use for

38

such listed drug . . . ."  FDC Act § 505(j)(2)(A)(vii), 21 U.S.C. § 355(j)(2)(A)(vii)

(emphasis added).  FDA has consistently treated these requirements as applying to

both original and reissue patents, as discussed in the FDA Decision.  FDA

Decision at 4-5; J.A. 44-45.  Because there is no distinction in the statute between

original patents and reissue patents – and indeed the FDA has treated the statute as

applying to both – an exclusivity period for each patent must likewise occur under

the plain language of the statute.  As discussed further below, the fact that FDA

followed a patent-by-patent approach to exclusivity periods for a drug with an

ANDA that predates MMA (like celecoxib) supports the conclusion that separate

exclusivity periods should be awarded for original and reissue patents.

FDA's denial of a shared period of exclusivity is also invalid under *Chevron*

Step Two.  FDA's position, adopted by the District Court, was that Teva's revived

period of sole 180-day exclusivity tied to the '068 patent and '048 patent was a

"bundle" that somehow precluded shared exclusivity among the first-filers to the

'048 patent.  As such, FDA denied first-filers to the '048 patent their right to a

180-day exclusivity period tied to the reissue patent (except Teva, which gains an

undeserved period of sole exclusivity in place of the exclusivity it should have

shared with Mylan, Watson, and perhaps others).

FDA's denial of shared exclusivity tied to the '048 patent conflicts with the

statutory framework established by the pre-MMA Hatch-Waxman Amendments,

39

and it arbitrarily treats first-filers to the '048 patent differently from first-filers to an original patent.

First, there can be no question that, in the pre-MMA regime for exclusivity periods, FDA embraced a patent-by-patent approach to exclusivity. This approach permitted multiple periods of exclusivity to be awarded for generic versions of the same drug, if different companies were first-filers to different patents covering that drug. *See Apotex Inc. v. FDA*, 414 F. Supp. 2d 61 (D.D.C. 2006), *aff'd*, 226 F. App'x 4 (D.C. Cir. 2007). *See also Watson Labs., Inc. v. Sebelius*, No. 12-1344, 2012 WL 6968224, at *3 n.2 (D.D.C. Oct. 22, 2012) ("FDA indicates that prior to the 2003 amendments, it granted exclusivity on a patent-by-patent basis. This meant that a period of exclusivity could potentially arise for each patent claimed by a drug." (citation omitted)). In fact, FDA continues to acknowledge that the patent-by-patent framework applies in pre-MMA cases. FDA Decision at 3; J.A. 43 ("[R]egulations governing pre-MMA 180-day exclusivity should be interpreted to award such exclusivity on a patent-by-patent basis. That is, eligibility for 180-day exclusivity would be based on which company submitted the first paragraph IV certification challenging each listed patent." (footnote omitted)). FDA deviated from its patent-by-patent framework when it refused to grant shared exclusivity to the first-filers to the '048 patent.

Agencies like FDA are required to treat like situations alike.  *See Burlington N. and Santa Fe Ry. Co. v. Surface Trans. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." (citations omitted)) .[15]  Yet FDA did exactly what courts have proscribed: according disparate treatment without reasoned explanation.  The FDA Decision treated two functionally indistinguishable categories of ANDA applicants – those who submit Paragraph IV certifications to a reissue patent and those who submit Paragraph IV certifications to an original patent – differently, without a justifiable explanation for doing so.  As such, the FDA Decision was arbitrary and capricious and must be reversed.

---

[15]    *See also Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997) ("Government is at its most arbitrary when it treats similarly situated people differently" (quoting *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982))); *United States v. Diapulse Corp. of Am.*, 748 F.2d 56, 62 (2d Cir. 1984) (holding that FDA must act "evenhandedly" and may "not 'grant to one person the right to do that which it denies to another similarly situated'" (quoting *Marco Sales Co. v. FTC*, 453 F.2d 1, 7 (2d Cir. 1971))); *Int'l Rehabilitative Sci., Inc. v. Kessler*, No. SA-93-CA-0242, Medical Devices Reporter (CCH) ¶ 15,181 (W.D. Tex. June 29, 1993) (finding that FDA's "divergent treatment" of two muscle stimulator devices was "glaring evidence of arbitrary action.").

The Hatch-Waxman Amendments create a balanced incentive structure intended to both protect the rights of patent holders and encourage the introduction of lower-cost generic products into the U.S. market.  Slip. Op. at 5-7; J.A. 255-57. Courts have rejected actions taken by FDA that would interfere with this incentive structure established by Congress.  *See Ranbaxy Labs. Ltd. v. Leavitt,* 469 F.3d 120, 126 (D.C. Cir. 2006) (finding that an FDA decision that would have deprived an ANDA applicant of 180-day exclusivity after that applicant fulfilled the statutory requirements was "inconsistent with the text and structure of the Act and, because it diminishes the incentive the Congress gave manufacturers of generic drugs, is inconsistent with the purpose of the Act."); *Ranbaxy Labs., Ltd. v. Leavitt*, 459 F. Supp. 2d 1 (D.D.C. 2006).

Yet, the FDA Decision in this case similarly diminishes the statutory incentive structure by depriving Mylan and Watson of the shared statutory exclusivity period to which they are entitled after having borne the risks and costs associated with fulfilling the statutory requirements for exclusivity.

If an ANDA applicant chooses to submit a Paragraph IV certification to a listed patent, thereby challenging that patent by declaring it to be invalid or not infringed, it exposes itself to costly and potentially lengthy patent litigation initiated by the patent holder.  The statutory incentive for taking this costly step,

42

and helping to clear the way for the earlier marketing of generic products, is that a first-filed Paragraph IV certification creates the basis for 180-day exclusivity.

FDA agrees that each of the statutory provisions mentioned above, regarding the listing of patents and certification to those patents, applies equally to original and reissue patents. And indeed, it is clear from the facts of this case that the risk and costs of patent litigation borne by ANDA applicants who certify to a reissue patent are equal to those borne by ANDA applicants who certify to an original patent. *See G.D. Searle LLC v. Lupin Pharms.*, *Inc*., No. 2:13-cv-00121 (E.D. Va. Mar. 14, 2014) (patent infringement litigation brought by G.D. Searle and Pfizer against Mylan, Watson, Lupin, Teva, and Apotex based on those companies' certifications to the '048 patent); J.A. 53. FDA offers no rationale for the disconnect between that undisputed fact and its unfounded determination that "FDA does not consider a reissued patent to be a new and distinct patent for purposes of 180-day exclusivity." FDA Decision at 5; J.A. 45. While FDA asserts that its purpose is to "consistently and predictably implement the FD&C Act," *id.*, and states conclusorily that its action is "consistent with the objectives of the Hatch-Waxman Amendments," FDA Decision at 9; J.A. 49, FDA fails to address or even acknowledge the damage its approach works on the basic statutory framework of incentives that Act creates. This is the essence of arbitrary and capricious decision making. *See Motor Vehicle Mfr's. Ass'n. of the United States*,

463 U.S. at 43, 52 (agency decision-making is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem," or fails to "offer a 'rational connection between the facts found and the choice made.'"); *see also Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (holding an EPA determination to be arbitrary and capricious where the Agency failed to explain why the promulgated change "with the potential to alter the . . . process in a way that may make it less environmentally protective is nevertheless consistent with the [Surface Mining Control and Reclamation Act].").

44

## CONCLUSION

This Court should reverse the District Court's decision upholding FDA's determination that Teva's marketing exclusivity period tied to the '068 patent did not expire in November 2008, and instruct the District Court to enter a Declaratory Judgment to that effect. Mylan and Watson also urge this Court to instruct the District Court to enter a Declaratory Judgment that FDA should award a separate, shared exclusivity period to eligible first-filers to the '048 patent.

Respectfully submitted,

HYMAN, PHELPS & MCNAMARA, P.C.

_____/s/ Douglas B. Farquhar_____

Douglas B. Farquhar
Jennifer M. Thomas
700 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Phone: (202) 737-5600
Facsimile: (202) 737-9329

VENABLE LLP

Ralph S. Tyler
575 7th Street NW
Washington D.C. 20004
Phone: (410) 244-7436
Facsimile: (202) 344-8300

*Attorneys for Mylan Pharmaceuticals Inc.*

AXINN, VELTROP & HARKRIDER LLP

_____/s/ Chad A. Landmon_____

Chad A. Landmon
950 F Street, N.W.
Washington, D.C. 20004
Phone: (202) 912-4700
Facsimile: (202) 912-4701

Mark D. Alexander
90 State House Square, 9th Floor
Hartford, CT 06103-3704
Phone: (860) 275-8100
Facsimile: (860) 275-8101

*Attorneys for Watson Laboratories, Inc.*

**CERTIFICATION OF COMPLIANCE
UNDER FED. R. APP. P. 32(a)(7)**

Pursuant to Fed. R. App. P. 32(a)(7)(C)(i), I hereby certify that the foregoing Brief for Plaintiffs-Appellants Mylan Pharmaceuticals Inc. and Watson Laboratories, Inc. complies with Fed. R. App. P.32(a)(7)(B)(i) because it contains 10,878 words, excluding the Corporate Disclosure Statement, Table of Contents, Table of Authorities, Addendum containing statutes, Certificate of Service, and this Certificate of Compliance.  I also certify that this Brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) and (6), because it has been prepared using Microsoft Word with a proportionally spaced 14-point Times New Roman font.


_____/s/ Douglas B. Farquhar_____          _____July 3, 2014_____
            (signature)                                            (date)

46

## CERTIFICATE OF SERVICE

I certify that on July 3, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


_____/s/ Douglas B. Farquhar_____        _____July 3, 2014_____
       (signature)                                              (date)

47